UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Lori Bahler-Kuhle | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 50370 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lori Bahler-Kuhle applied for Social Security disability benefits on May 11, 2013, alleging that she was disabled because of back problems and anxiety and depression. The administrative law judge ("ALJ") found that her ailments were not so severe that they would prevent her from working a sedentary job subject to certain restrictions. In this appeal, plaintiff argues that the ALJ's analysis of her mental impairments was flawed.[2]

The ALJ's decision is affirmed. Plaintiff's arguments on appeal run headlong into three fundamental principles: (1) when a claimant is represented by counsel at the hearing, the ALJ is entitled to presume that the best case was made, *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988); (2) a claimant bears the burden of proof for the first four-steps of a disability determination, *Brisco ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); (3) a court may not merely reweigh the evidence on the appeal to reach a different result, *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). In this case, plaintiff was represented by excellent counsel at the administrative hearing, but no additional evidence was elicited; claimant failed to meet her

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] Because plaintiff raises no challenges to the ALJ's discussion of her back impairment or other physical problems, the Court will not discuss those issues or the facts relating to them.

1

burden; and now, on appeal, this Court is being asked to simply reweigh the evidence. The ALJ's decision is based on substantial evidence. Attempts to simply poke holes in the weighing of the evidence will not result in remand.

**BACKGROUND**

On August 18, 2015, a hearing was held before the ALJ. Plaintiff, who was then 40 years old, testified. that she was married and had a 17-year old son. R. 14-15. She last worked cleaning offices as part of a business she and her sister ran from 2003 to 2011. They were the only two workers, and were able to set their own hours. She quit in 2011 because the job required "too much bending," which was difficult with her back problems. R. 16, 18. Before operating this company, plaintiff was a stay-at-home mother. Plaintiff stated that she did not feel she could work anymore because of her anxiety and depression, as well as some forgetfulness. As for treatment, plaintiff was seeing a psychiatrist (Dr. Irfan) roughly every month, sometimes at longer intervals. *See* R. 20 ("Sometimes it's once a month. Sometimes it goes to three months, at the most."). Starting in 2009, she began taking medications for these problems. Even with the medications, she still had "a lot of ups and downs" and sometimes will "sit and cry" and "seclude [herself] into the bedroom" because she does not "want to be around anybody." *Id.*

Plaintiff testified that she had panic attacks. They contributed to her decision to stop working on the cleaning job. She stated that one trigger for the panic attacks was "a big crowd of people." R. 24. Plaintiff stated that she sometimes missed doctor appointments at Rosecrance because she was forgetful. Plaintiff was asked about one time when Dr. Irfan advised her to "go over to the hospital" because plaintiff was—in her words—"just a wreck" and was having suicidal thoughts. R. 26. Plaintiff did not follow through with the recommendation because she did not want to leave her 17-year old son at home. Plaintiff stated that her mental conditions

affected her ability to care for her son because she would "isolate [herself] a lot" by going into the bedroom and "just lay[ing] there" for a couple hours. *Id.* But she tried to avoid letting her son know that she was having any problems with anxiety or depression.

On September 17, 2015, the ALJ issue her decision finding plaintiff not disabled. At Step Three, the ALJ concluded that plaintiff did not meet a Section 12 mental health listing because she did not meet the Paragraph B criteria. The ALJ found that plaintiff had "mild" limitations in activities of daily living; "moderate" limitations in social interaction; "moderate" limitations in concentration, persistence, or pace; and no episodes of decompensation. The ALJ then found that plaintiff had the residual functional capacity ("RFC") to do sedentary work, subject to various restrictions designed to accommodate her anxiety and depression. The ALJ provided a number of reasons for this finding, including that plaintiff's treatment had been effective. *See* R. 105 ("her psychiatric treatment, both counseling and medications, have kept her symptoms under control, so that she can function if not facing certain types of situations—such as significant dealings with the public (as identified in the residual functional capacity)").

## DISCUSSION

As noted above, plaintiff limits her arguments to the mental health impairments. Plaintiff's briefs also mostly focus on the ALJ's listing analysis at Step Three, rather than on the RFC analysis. As the Supreme Court has noted, the purpose of the listings is to "streamline[] the decision process by identifying those claimants whose medical impairments are *so severe* that it is likely they would be found disabled *regardless of* their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (emphasis added). In short, qualifying as disabled under a listing is typically viewed as more difficult than doing so through the RFC analysis.

To prevail under one of the Section 12 mental health listings, plaintiff must show that she had "marked" limitations under at least two of the first three Paragraph B criteria. In her opening brief, she did not tie her arguments to this criteria, but instead offered a looser structure organized around four "assertions" allegedly made by the ALJ, to which plaintiff then offered her own "rebuttal." Rather than following this organizational scheme, the Court finds that it will be easier to simply evaluate each of the three Paragraph B criteria, assessing whether the ALJ relied on substantial evidence in reaching her decisions. The ALJ specifically addressed these three criteria in the first half of the decision.

## I. Activities of Daily Living.

The ALJ provided the following analysis:

> In activities of daily living, the claimant has mild restriction. One thing to note initially is that according to section 12.00A of the introductory material to the mental listings, the functional limitations in paragraphs B and C must be the result of the mental disorder contained in the diagnostic description, as manifested by the medical findings in paragraph A for the relevant listing section(s). In this case many of the claimant's alleged limitations on her activities of daily living are related to her back complaints, and to that extent are not properly considered in the B criteria rating. Even so, her activities of daily living have been fairly full. She cares for her husband and son and engages in a wide variety of typical household activities, such as preparing meals, light house chores, and shopping. She goes out both by herself and with others. She is able to care not only for her own typical personal care needs, but has follow-up with a wide variety of appointments for her back and psychiatric issues. Overall, there is only a mild restriction on her activities of daily living attributable to her psychological condition.

R. 99. Later in the RFC discussion, the ALJ elaborated slightly on these activities, describing plaintiff's answers on the Function Report (Exhibit 6E) and her testimony. But these references mostly echo the same points made above. *See, e.g.,* R. 104 ("The claimant's daily activities, recounted earlier in this decision, have shown she is able to take care of herself and a teenage son, forge a new relationship and get married, and perform normal household tasks, such as cleaning, shopping and preparing meals.").

Plaintiff's raises several arguments as to why this analysis is insufficient. Plaintiff first notes that the ALJ cited plaintiff's back problems as one factor limiting some of her activities. But plaintiff fails to explain why the ALJ's assertion was unjustified. One of the key sources about plaintiff's daily activities was the Function Report. This report contains several statements supporting the ALJ's assertion. *See* R. 243 ("my back pain wakes me up out of a deep sleep and I have to get up and move around every 2 hours"); R. 244 ("I can't prepare meals alone because I can't stand for a long period of time due to back pain"); R. 246 (plaintiff does not do yard work because "back pain stops [her]"); R. 252 (plaintiff has trouble getting in and out of truck because of "lower back pain"); R. 252 (plaintiff cannot sit for at least two hours without having to get up and stand or walk "due to back pain").

Plaintiff's main argument is that there are numerous "contradictory" facts undermining the ALJ's conclusion. In show-don't-tell fashion, plaintiff simply lays out a bullet-point list of ten facts or assertions that are allegedly self-evidently contradictory.[3] However, upon closer examination, this list is insufficient for several reasons.

First, many of these ten assertions do not address the relevant question, which is plaintiff's daily *activities*. Instead, they offer evidence about plaintiff's moods or goals or feelings. For example, plaintiff's belief that she needs therapy more than once a month does not speak to what activities she was then able to do on a regular basis. The various statements about plaintiff's anxiety (*e.g.* that it occurred more around the holiday) are again not probative on

---

[3] These ten assertions are as follows: **(1)** "Dr. Irfan [] had been pushing for her to come to Rosecrance for about a year because he felt she needed more support and counseling"; **(2)** "plaintiff herself reports that she needs therapy more than once a month"; **(3)** "plaintiff would like greater control of anxiety and depression and would like to develop more independence" and would "like to reduce her depressive episodes to less than 2-3x a week"; **(4)** "plaintiff has problems shopping in crowds and going to family gatherings"; **(5)** "plaintiff has anxiety attacks and needs to achieve more independence"; **(6)** "plaintiff's anxiety is worse and she is not sleeping more than 4-5 hours a night"; **(7)** "plaintiff is getting married and not sure how she will cope in front of a large crowd," and she has "been isolating at home"; **(8)** "plaintiff wants to die in her sleep" and "[h]er physical condition is impacting her ability to obtain mental health treatment"; **(9)** "anxiety attacks around the holidays"; and **(10)** "Dr. Irfan told plaintiff to go to the ER after an appointment due to worsening depression." Dkt. #8 at 3.

whether plaintiff was able, *despite her anxiety*, to do daily activities. In the abstract, it is possible that a person's anxiety could be so debilitating that it would prevent a person from doing daily activities, but this is the question at issue. It cannot be assumed away, but must be proven with concrete examples. For these reasons, many of these assertions are not on their face contradictory to the ALJ's finding.[4]

Second, and relatedly, many of these assertions are vague. Plaintiff's desire for greater control and more independence cannot be easily evaluated without some context and a better understanding of what she meant by those terms. Put differently, many full-time workers might have similar thoughts, and they might also periodically suffer from bouts of anxiety or depression or face periods when their lives, due to external stressors, become psychologically difficult for a time. To cite one example, anxiety attacks around the holidays is an experience that many people might experience to some degree. It is not enough for plaintiff to simply point to general statements that she was suffering from anxiety or panic attacks or was isolating herself in the bedroom on occasion. This is because the ALJ agreed that plaintiff had some of these problems, and then included several accommodations in the RFC to account for them. The ALJ emphasized this point, stating as follows: "[Plaintiff's] anxiety and difficulty interacting with others has also been considered and incorporated into restrictions precluding more than occasional interaction with the public and in working in tandem with others. These are not minor restrictions. In fact, these restrictions rule out a large percentage of jobs." R. 104.

Third, even if the above ten assertions were all directly relevant to plaintiff's daily activities and even if they were "contrary" to the ALJ's findings, this does not mean that the ALJ's decision was unsupported. In most cases, there is some evidence contrary to either side's

---

[4] The Court acknowledges that several of the ten assertions reflect more severe symptoms. Although this evidence is more compelling in a general sense, it is still non-responsive to the precise question about plaintiff's daily activities.

6

position. The important question is whether the ALJ failed to consider the contrary evidence. *See Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence contrary to his conclusion). However, when the ALJ has considered the contrary evidence, then the Court "must" defer to the ALJ's interpretation of that evidence so long as it was a reasonable interpretation. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). Here, plaintiff has not argued that the ten assertions were ignored by the ALJ.

Fourth, plaintiff's ten assertions do not even address several of the ALJ's specific findings. The ALJ noted that plaintiff "engages in a wide variety of typical household activities, such as preparing meals, light house chores, and shopping"; that she "goes out both by herself and with others"; and that she was able to "follow-up with a wide variety of appointments for her back and psychiatric issues." R. 99. As the Government argues, the ALJ's examples fit within the typical activities that ALJs should consider, as contemplated by Listing 12.00. Dkt. #13 at 4.

Fifth, plaintiff addresses a few of the specific activities relied on by the ALJ, but the plaintiff offers criticisms that ultimately amount to disagreements over what weight should be given to those activities. For example, in response to the ALJ's observation that plaintiff was taking care of her son, plaintiff (or more precisely, her counsel) speculates that plaintiff's son *may* not have needed much parental help. *See* Dkt. #8 at 4 ("Based on the testimony at the hearing, and plaintiff's medical records, it is really not clear how the judge felt the plaintiff was taking care of her 17-year old son. Additionally, a 17-year old *typically* is fairly independent *in terms of self care*.") (emphasis added). Plaintiff's point seems to be that it is easier to take care of a 17-year old than, say, an infant. In terms of physical care, which is how plaintiff subtly defines the issue, this may be true, but it is also often the case that teenagers require other, less physical

types of parental assistance. In any event, there is no reason to believe that the ALJ was unaware of these distinctions or gave undue weight to this one factor among the many relied on.

Plaintiff raises similar qualifications about the ALJ's assertion that she was able to go to her many doctor appointments. Plaintiff first argues that "[t]here are multiple notes in the file that she avoids driving," but it is not clear why this changes the ALJ's larger point that she was able to schedule the appointments and then get to them (however she may have done so). Dkt. #8 at 4-5. As a fallback argument, plaintiff argues that, even if she was able to get to appointments on her own, then "such activities" would "detract from her ability to maintain employment." *Id.* at 5. This argument—that merely having to go to doctor appointments would render someone disabled—is one that could apply to many disability claimants. Even assuming that this is a valid line of argument, and plaintiff has not cited to any authority to suggest that it is, there would still be the problem that plaintiff has not established the factual predicate that her appointments were so numerous that she could not work full-time. Plaintiff only saw Dr. Irfan once a month, and sometimes even less frequently. This does not seem like an overbearing amount. In sum, although plaintiff believes her limitations in daily activities were "marked," she has not provided a basis for overturning the ALJ's contrary conclusion that they were only "mild." The Court will not reweigh this evidence. *Terry*, 580 F.3d at 475.

**II.     Social Functioning.**

Set forth below is the ALJ's analysis of social functioning, which is the second of the three Paragraph B criteria at issue:

> In social functioning, the claimant has moderate difficulties. Her allegations regarding difficulty working with others have been fully acknowledged and accommodated into the RFC. She clearly is somewhat limited in terms of interacting with others, both because of her psychiatric issues and perhaps also to some extent because of her back pain (which is not properly considered under the B criteria). However, a "marked" limitation, which suggests an inability to perform

> SGA, is not warranted. In assessing the claimant's social functioning, the lack of evidence suggesting dysfunctional social behaviors in this case is relevant. For example, the record fails to reveal evidence of verbal or physical altercations with others or being fired for inappropriate behavior. The claimant has reported, or the record otherwise reflects, that the claimant has engaged in the following activities (which require some degree of social skill or effectiveness in interacting with others): going out into public alone; carrying out a daily routine without unusual dependence on others; going to family functions, including, and organizing her own wedding. The treatment notes fail to reflect that the claimant had any significant difficulty interacting with health care providers while receiving treatment (e.g., no evidence of anger, lack of cooperation, aggressiveness or generally inappropriate behavior toward health care personnel). The claimant's behavior at the hearing was entirely proper in terms of interacting with others, showing no signs of difficulty socializing. Also, this rating is supported by the opinion of the state agency psychological consultant, who reached the same conclusion regarding claimant's social functioning.

R. 99-100.

Plaintiff's only response to this analysis is to assert that the ALJ relied on boilerplate language and provided no concrete examples other plaintiff's wedding planning. But this line of argument misses the ALJ's point, which is that there was an *absence* of evidence showing problems, conflicts, or dysfunctional behaviors. It is hard to cite examples of an absence. Plaintiff is the one who has failed to provide examples showing that she had "marked" limitations in social functioning. *See Briscoe*, 425 F. 3d at 351-52 (plaintiff bears burden). Instead, she again falls back on her general assertion that she experienced mood swings, crying spells, anxiety attacks, and suicidal thoughts. But she never connects these feelings to any specific problems in interacting with others. She argues only that her feelings should be viewed as "physical abuse *[to] herself*." Dkt. #8 at 6 (emphasis added). In short, this line of argument fails to address the issue of social functioning.

As for the wedding, plaintiff argues that the "record is devoid of evidence as to how large or formal the wedding was." *Id.* at 5. Here again, plaintiff appeals to a mushy factual agnosticism in the hope of undermining the ALJ's assertion. Specifically, her counsel speculates that

9

plaintiff's wedding "may very well have been a courthouse wedding," and complains that the ALJ did not ask about it at the hearing. *Id.* Plaintiff's unstated premise seems to be that it would require no effort or skill to organize a courthouse wedding. But plaintiff presented no evidence that the wedding was a simple courthouse wedding. *See Briscoe*, 425 F.3d at 351-52; *Sears*, 840 F.2d at 402. Moreover, plaintiff's argument is undercut by several statements in her brief. She states that she "complained to her providers on multiple occasions that she was worried about her wedding." *Id.* But the fact that plaintiff was worried about it arguably suggests that the wedding was not simply a rubber-stamp ceremony with no people attending. As for her worries, plaintiff was still able to plan the wedding and go through the ceremony despite this fact. By extension, this same skill could be applied to workplace anxiety—at least, that is one reasonable interpretation that the ALJ could draw. But even more damaging to plaintiff's small-courthouse-wedding theory is the following statement, which was one of plaintiff's ten assertions set forth earlier in her opening brief: "plaintiff is getting married and not sure how she will cope *in front of a large crowd*." Dkt. #8 at 3 (emphasis added). This statement contradicts counsel's speculation that her client had a small wedding.

### III. Concentration, Persistence, or Pace.

For the third paragraph B criteria, the ALJ provided the following analysis:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant's moderate difficulties have been taken into account in the RFC finding below. The treatment notes generally do not suggest major difficulty concentrating—the claimant quite ably pursued her treatment and conveyed her medical needs throughout the relevant period of time. She also was able to testify effectively, with no evidence of diminished concentration. The state agency consultants also rated the claimant as only "moderately" limited in terms of her ability to concentrate. While difficulty concentrating is undoubtedly present, and has been acknowledged in the RFC and in this "moderate" rating, the very serious problems denoted by a "marked" limitations are not warranted based on the claimant's ability to function as shown in the evidence.

R. 100.

Plaintiff argues that this analysis was "minimal" and suffers from a "faulty understanding" of her mental impairments. Dkt. #8 at 6. However, plaintiff's provides little evidence to support this thesis. Plaintiff merely states that she "often reported fatigue to Dr. Irfan" and "had trouble doing activities such as leaving the house independently." *Id.* This argument is cursory, and suffers from many of the same problems already identified above—namely, plaintiff's assertions are vague; they are not tied to the precise criteria at issue; and they are not necessarily inconsistent with the ALJ's finding (here, that she had *moderate* limitations in concentration, persistence, or pace). It is not clear, for example, how her trouble leaving the house was relevant to her ability to concentrate on a job requiring simple and routine tasks.

## IV. Remaining Arguments

There are two remaining issues that were not covered by the above discussion.

**A. GAF Scores.** Plaintiff argues that the ALJ noted that plaintiff's GAF scores "ranged around 50 for much of the period," but then ignored that plaintiff "had multiple GAF scores in the 30s-40s." R. 103; Dkt. #8 at 6. Plaintiff argues that an ALJ may not cherry-pick GAF scores. Plaintiff is correct on this point. *See Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (improper for the ALJ to "seize upon" a GAF "high-water" mark of 60 while ignoring other lower scores).

But here, the ALJ did not ignore the contrary GAF scores. Instead, she addressed this issue at some length in the following two paragraphs:

> As mentioned in the summary of the evidence, the Rosecrance records include GAF score[s] that range from approximately 30-50 (B13F). Generally, low scores are not dispositive for Social Security Disability purposes. This is, in part, because the GAF score is not purely an evaluation of psychological limitations. Rather, it is comprised of three factors "psychological, social and occupational functioning." *The Diagnostic and Statistical Manual of Mental Disorders* ("DSM- IV") p. 30. Additionally, while GAF scores are assessments of functioning that can be useful in determining a claimant's functional capabilities, such scores are also highly

> subjective and lack standardization. The updated DSM-V has eliminated GAF scores as a diagnostic tool. Nevertheless, claimant's GAF scores have been considered in reaching the findings here.
>
> The lowest of claimant's GAF scores was assessed when claimant was in an acute depressive episode shortly after leaving an abusive relationship. She was experiencing significant suicidal ideation at that time. But her condition improved, as did her GAF scores. Her later scores are significantly higher. A GAF score of 41-50 suggests the presence of "serious" symptoms or serious impairment in social or occupational functioning, and a score of 50, which was assigned on multiple occasions, borders between "moderate" and "serious" symptoms. In addition, the treatment notes from Dr. Irfan, mentioned earlier, do not generally report such serious psychiatric symptoms. Ultimately, after considering and balancing all of the evidence of record, this decision acknowledges that claimant has limitations resulting from her mental health condition and has accordingly limited her to simple unskilled work, requiring few changes and few decisions, as well as limited contacted with the public, co-workers and supervisors.

R. 105 (footnote omitted).

In this discussion, the ALJ expressed some initial reservations about the general persuasiveness of GAF scores, and acknowledged that plaintiff had some lower scores. The ALJ did not ignore those scores, but instead offered a rationale to explain why they were lower, which was the ending of an abusive relationship. The ALJ also considered other contemporaneous evidence (*i.e.* Dr. Irfan's treatment notes) to help put the scores in a larger context. The Court finds that the ALJ's analysis, taken as a whole, is a reasonable approach. It would have perhaps been more consistent if the ALJ had simply ignored the GAF scores altogether, but it is clear that this evidence was only a small part of the ALJ's decision. Thus, if there were any errors in this analysis, the Court finds that they were harmless errors.

**B. Supporting Medical Opinions.** Plaintiff has suggested, in very brief fashion, that the ALJ lacked supporting medical testimony. However, in her opening brief, plaintiff mentioned this point only in a general way at the end of her brief. *See* Dkt. #8 at 6 ("To the extent that the ALJ made conclusions about plaintiff's mental health without supporting medical expert

testimony, it was an error."). In its response brief, the Government noted that the ALJ relied on the opinions from two State agency physicians. *See* Dkt. #13 at 9 ("The ALJ considered the opinions from the State agency consultants at both step three and when determining Bahler-Kuhle's RFC."). Then, in her reply brief, plaintiff for the first time raised the argument that the State agency consultants "last evaluated the evidence on April 17, 2014" and thus were not able to review some additional evidence from Dr. Irfan which, according to plaintiff, contains "significant treatment notes." Dkt. #14 at 2-3. However, plaintiff fails to discuss what this evidence was, and why it was significant or would have changed the earlier conclusions. On the whole, this argument is undeveloped, and not persuasive in any event. Plaintiff's main argument in this appeal has been about the nature of her daily activities. It is not clear how a medical expert would have aided in that inquiry, and plaintiff has not even requested that a medical expert should be called if this case were remanded.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the decision of the ALJ is affirmed.

Date: January 29, 2018  By: _____
Iain D. Johnston
United States Magistrate Judge

13